UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

HAROLD CORDOVA,

Petitioner,

v.

FERNANDIES FRAZIER,[1] *et al.*,

Respondents.

Case No. 3:19-cv-00388-MMD-CLB

ORDER

## I.    SUMMARY

Petitioner Harold Cordova, who pleaded *nolo contendere* to second-degree murder with use of a deadly weapon and was sentenced to 132 to 330 months of imprisonment. (ECF No. 29-21.) Cordova filed a counseled amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 13 ("Petition")). This matter is before the Court for adjudication of the merits of Cordova's Petition, which alleges that his plea was invalid, that he received ineffective assistance of counsel, and that his counsel suffered from a conflict of interest. (ECF No. 13.) For the reasons discussed below, the Court denies Cordova's Petition and a certificate of appealability.

///

///

///

_____

[1]Cordova is currently housed at Northern Nevada Correctional Center. Fernandies Frazier is the current warden for that facility. At the end of this order, this court directs the clerk to substitute Fernandies Frazier as a respondent for Respondent Isidro Baca. *See* Fed. R. Civ. P. 25(d).

1

2

## II.     BACKGROUND

### A.     Arraignment and sentencing

Cordova was charged with murder with the use of a deadly weapon for killing Mark Smith by stabbing him in the abdomen. (ECF No. 27-2 at 2-3.) On June 23, 2015, Cordova pleaded not guilty and waived his right to a speedy trial. (ECF No. 28-3 at 3-4.) A trial was set for February 22, 2016. (*Id.* at 5.)

On December 14, 2015, Cordova was psychiatrically evaluated by Dr. Melissa Piasecki. (ECF No. 52-1 at 3.) Dr. Piasecki submitted her final report on February 16, 2016. (*Id.*) The report found that Cordova had previously been diagnosed and treated for Post-Traumatic Stress Disorder ("PTSD") and that he had suffered various symptoms, including nightmares, flashbacks, and panic attacks. (*Id.*) The report also stated that Cordova had most recently been treated with a variety of medications, including "Venlafaxine, Gabapentin, prazosin, hydroxyzine, and trazodone." (*Id.*)

During her examination of Cordova, Dr. Piasecki found that he appeared to understand when she explained the limits of confidentiality and her role as an evaluator. (*Id.* at 4.) She reported that Cordova was "oriented to person, place, date, and situation." (*Id.*) She stated that Cordova had good eye contact and spontaneous speech, and that he was "digressive but redirectable." (*Id.*)

On January 26, 2016, Cordova signed an agreement to plead *nolo contendere* to the offense of second-degree murder with the use of a deadly weapon. (ECF No. 14-2 at 2.) The plea agreement provided that the state would recommend no more than 25 years imprisonment, with parole eligibility after 10 years had been served, plus an additional consecutive sentence of 12 to 30 months for the use of a deadly weapon. (*Id.* at 4.) The plea agreement also stated that Cordova was satisfied with his counsel's advice and representation, and that Cordova understood that if he was not satisfied with his counsel that he should advise the Court. (*Id.* at 6.)

2

1   On January 28, 2016, Cordova pleaded *nolo contendere*, and the state district

2   court canvassed Cordova regarding his plea. (ECF No. 14-1.) The state district court

3   asked Cordova whether he understood the proceedings, and whether he was comfortable

4   with the representation that he had received, and Cordova answered in the affirmative.

5   (*Id.* at 5-6.) Cordova also responded in the affirmative when asked whether he had read

6   and understood the *nolo contendere* plea agreement. (*Id.* at 6.) The state district court

7   asked whether Cordova understood that the state district court would accept the *nolo*

8   *contendere* plea "as though [Cordova] had pled guilty, for all intents and purposes," and

9   Cordova responded in the affirmative. (*Id.*) The state district court then accepted

10  Cordova's plea and told Cordova that it would set a date for sentencing. (*Id.* at 14.) On

11  March 4, 2016, the state district court issued a judgment finding Cordova guilty and

12  sentencing him in line with the plea agreement. (ECF No. 14-3.)

13      **B.      Appeal and state post-conviction proceedings**

14  Cordova did not file a direct appeal. On June 23, 2016, Cordova filed a pro se state

15  post-conviction petition. (ECF No. 13-4.) The state district court appointed counsel, who

16  filed a supplemental petition. (ECF No. 13-5.) In both petitions, Cordova argued that his

17  defense counsel had provided ineffective assistance of counsel. (ECF Nos. 13-4, 13-5.)

18  On November 16, 2017, the state district court held an evidentiary hearing, during which

19  Cordova and co-trial counsel all testified. (ECF No. 14-6.)

20  During the evidentiary hearing, Defense Counsel 1[2] testified that defense counsel

21  had requested Cordova's medical records from the VA and retained Dr. Piasecki to

22  evaluate Cordova's mental health. (*Id.* at 15-16.) He further testified that Dr. Piasecki had

23  provided a report that defense counsel had submitted as mitigation at sentencing, and

24  that defense counsel had discussed a potential insanity defense with Dr. Piasecki. (*Id.* at

25  16.) Dr. Piasecki had told defense counsel that "it would not likely be a viable defense."

26  _____

27  [2]The Court will refer to Cordova's co-trial counsel as "Defense Counsel 1" and "Defense Counsel 2."

28

1  (*Id.*) Defense Counsel 1 further testified that Defense Counsel 2 had discussed the

2  possibility of an intoxication defense with Dr. Piasecki, but that Dr. Piasecki had

3  responded that she did not believe "that intoxication would be a valid defense beyond

4  anything besides like a first-degree murder defense." (*Id.* at 16-17.)

5      Defense Counsel 1 also testified that the prosecution had substantial evidence

6  against Cordova, including a statement on a 911 call, where Cordova said that he had

7  stabbed Mark Smith because Smith had told him to, and a call from jail where Cordova

8  told a friend that he had just stabbed someone. (*Id.* at 17-19.) Defense Counsel 1 testified

9  that, based on the prosecution's evidence, he felt that there was a significant risk that

10  Cordova could be convicted of first-degree murder, and that he would have considered

11  second-degree murder a win in this case. (*Id.* at 19.)

12      When asked whether he had gone over the plea agreement with Cordova word for

13  word, Defense Counsel 1 responded that he had done so. (*Id.* at 31.) Defense Counsel 1

14  went on to testify that he and co-counsel had asked Cordova whether he had any

15  questions about the agreement, and he did not recall Cordova having any questions. (*Id.*)

16      Defense Counsel 2 testified that he believed that Cordova had understood the plea

17  agreement. (*Id.* at 71.) Defense Counsel 2 further testified that he had discussed with

18  Cordova on a number of occasions that the minimum sentence would be 10 to 25 years

19  for second-degree murder, with an additional 12 to 30 months for use of a deadly weapon.

20  (*Id.* at 72.) He stated, "that was part of the selling point," for agreeing to the plea deal.

21  (*Id.*) Defense Counsel 2 also testified that after Cordova had been sentenced, he asked

22  whether Cordova wanted to appeal, and Cordova "kinda huffed or chuckled and said, No,

23  and shook his head." (*Id.* at 60.)

24      Cordova testified that he had agreed to the plea deal, "Because I was told they

25  didn't have enough time to prepare for a trial." (*Id.* at 80.) Cordova stated that defense

26  counsel had a year to prepare for trial, but that all they did was negotiate for a plea

27

28                                          4

bargain. (*Id.*) Cordova testified that defense counsel "didn't even ask [him] what [he] did," and repeatedly told him, "Do not talk to us about the case." (*Id.* at 81-82.)

Cordova also testified that he had reluctantly pleaded *nolo contendere*; "I said not guilty to begin with and I said not guilty several times. And then I pleaded *nolo contendere* and [the state district court judge] said it meant the same thing." (*Id.* at 84.) Cordova later similarly testified that he had pleaded *nolo contendere* because "the judge asked me if I knew the difference between *nolo contendere* and not guilty, and I said no. And she said, well, if you plead *nolo contendere*, it's the same thing." (*Id.* at 94.)

Cordova then testified that he had pleaded no contest because defense counsel had told him that they did not have time to prepare for trial and that defense counsel had told him "it was probably going to be in [his] interest, [his] best interest to sign this document of guilty, second-degree." (*Id.* at 95-96.) Cordova was then asked whether he had told the state district court judge that he could not enter a no-contest plea, and that defense counsel had told him that he could not go to trial because there was not enough time. (*Id.* at 97.) Cordova responded, "That's true," and then "I told the judge that." (*Id.*) When told that such statements were not in the transcript, Cordova responded, "Well, I don't know that" and "I never received the transcripts." (*Id.* at 98.) When asked whether Cordova believed that the court reporter had failed to take down his statements, Cordova responded "No. I'll believe the document." (*Id.* at 98-99.)

When asked whether he had discussed the possibility of an appeal with Defense Counsel 2, Cordova stated that they had discussed it. (*Id.* at 75.) Cordova said that he did not have enough time to file an appeal within the 30-day deadline, but that he had filed a habeas petition. (*Id.* at 75-76.)

The state district court denied Cordova's petition, finding that defense counsel "afforded [Cordova] the effective assistance of counsel, as set forth in *Strickland v. Washington*." (ECF No. 14-7 at 7.) Cordova appealed, and a new attorney was appointed

to represent Cordova. (ECF No. 14-9.) The Nevada Supreme Court affirmed the state district court's denial of relief. (ECF No. 14-11.)

### III.   GOVERNING STANDARDS OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be

objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).[3]

## IV.   DISCUSSION

### A.   Ground 1—validity of guilty plea

In ground 1, Cordova alleges that his plea was not knowingly, intelligently, or voluntarily entered in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 13 at 7.) Specifically, Cordova contends that he did not understand the difference between a not guilty plea and a plea of *nolo contendere*, and

---

[3]In the Petition, Cordova asserts that the standard of review in 28 U.S.C. § 2254(d) violates the U.S. Constitution. (ECF No. 13 at 6.) Specifically, Cordova asserts that the standard violates "the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen)." (*Id.*) Cordova does not provide any citation or legal analysis to support this position and acknowledges that the Ninth Circuit has already rejected some of these arguments. (*Id.* (citing *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007))). Because Cordova does not provide any legal citations or analysis to support his assertion that the standard of review in 28 U.S.C. § 2254(d) violates the U.S. Constitution, the Court declines to consider this argument.

that his mental health issues and medication regime made him unable to enter a knowing and voluntary plea. (*Id.* at 7-8.)

### 1.    Relevant law

The federal constitutional guarantee of due process of law requires that a guilty plea be knowing, intelligent, and voluntary. *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). "The voluntariness of [a petitioner's] plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749. Addressing the "standard as to the voluntariness of guilty pleas," the Supreme Court has stated: a "plea of guilty entered by one fully aware of the direct consequences . . . must stand unless induced by threats . . . , misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business." *Id.* at 755; *see also North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (noting that the longstanding "test for determining the validity of guilty pleas" is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant").

A criminal defendant may not plead guilty unless he does so competently. *Godinez v. Moran*, 509 U.S. 389, 396 (1993). To meet the competency standard to plead guilty, it must be determined "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has a 'rational as well as factual understanding of the proceedings against him.'" *Id.* (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subject to a trial.").

8

1

## 2.     State court determination

2

In affirming the denial of Cordova's post-conviction petition, the Nevada Supreme

3

Court held:

4
5
6
7
8
9
10
11
12
13
14
15
16
17

> Next, Cordova argues that trial counsel's lack of communication, coupled with his psychiatric issues and medication, prevented him from understanding the consequences of his plea or the defenses available if he went to trial. We conclude that this argument lacks merit. Cordova signed a plea memorandum that described the rights he was waiving with the entry of his plea and the possible sentences he faced. At the plea canvass, Cordova acknowledged that he read and signed the agreement. He also orally acknowledged the rights he was waiving and the penalties he faced. He stated that, based on the evidence, it was in his best interest to enter the nolo contendere plea. There is no indication from the record that Cordova's mental health issues or prescribed medications prevented him from understanding the guilty plea proceedings. *State v. Freese*, 116 Nev. 1097, 1105, 13 P.3d 442, 448 (2000) ("This court will not invalidate a plea so long as the totality of the circumstances, as shown by the record, demonstrates that the plea was knowingly and voluntarily made and that the defendant understood the nature of the offense and the consequences of the plea."); *Molina v. State*, 120 Nev. 185, 191, 87 P.3d 533, 537-38 (2004) ("A thorough plea canvass coupled with a detailed, consistent, written plea agreement supports a finding that the defendant entered the plea voluntarily, knowingly, and intelligently." (internal quotation marks omitted)). Further, given that the potential defenses were not likely to be successful, he failed to demonstrate that additional communication with counsel about those defenses would have affected his decision to enter a plea.

18

(ECF No. 14-11 at 4.)

19

///

20

///

21

///

22

///

23

///

24

///

25

///

26

///

27

28

9

### 3.      Analysis[4][5]
#### i.      Cordova's understanding of the *nolo contendere* plea

Cordova alleges that he did not understand the meaning of a *nolo contendere* plea and that he believed it was equivalent to a plea of not guilty. (ECF No. 13 at 7.) However, the record does not support these allegations. As the Nevada Supreme Court reasonably noted in its decision, Cordova signed the plea agreement, was canvassed regarding his plea agreement, stated that he understood that a *nolo contendere* plea would be treated as equivalent to a guilty plea, and discussed the sentencing possibilities if he went forward with a *nolo contendere* plea. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (explaining that the defendant's representations and "any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity"); *Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012) ("Petitioner's statements at the plea colloquy carry a strong presumption of truth.").

Therefore, based on the record, the Nevada Supreme Court's determination that Cordova failed to demonstrate that he did not understand the consequence of his *nolo contendere* plea constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts. *See Godinez*, 509 U.S. at 396; *Dusky*, 362 U.S. at 402; *Brady*, 397 U.S. at 748.

---

[4]In his reply brief, Cordova argues that the Nevada Supreme Court's decision is not entitled to deference because the decision was based on an unreasonable determination of the facts. (ECF No. 61 at 14.) For the reasons discussed in its analysis, the Court disagrees that the Nevada Supreme Court's decision was based on an unreasonable determination of the facts.

[5]Cordova's Petition cites to jail medical records that indicate confusion or odd behavior leading up to the plea hearings. (ECF No. 13 at 10-12.) However, these records were not presented to the Nevada Supreme Court, and, thus, they are not considered in this analysis. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

### ii.    Cordova's mental health issues and medication regime

Cordova asserts that his mental health issues and medication regime prevented him from understanding the proceedings and entering a knowing, voluntary, and intelligent plea. (ECF No. 13 at 8-13.) Cordova also argues that the record of his mental health issues and medication regime make the Nevada Supreme Court's finding that "(t)here is no indication from the record that Cordova's mental health issues or prescribed medications prevented him from understanding the guilty plea proceedings" an unreasonable determination of fact. (*Id.*)

The Nevada Supreme Court did not find that Cordova had no mental health issues, only that the record did not indicate that these mental health issues prevented Cordova from understanding the plea proceedings. On its own, the fact that Cordova suffers from mental health issues and was taking medication, which the Nevada Supreme Court acknowledged, does not indicate that Cordova did not understand the proceedings. *See Atkins v. Virginia*, 536 U.S. 304, 318 (2002) (recognizing that those with intellectual disabilities are "frequently . . . competent to stand trial"). The record of Cordova's mental health issues does not explain how his mental health issues might have interfered with his ability to consult with counsel or understand the proceedings against him. *See, e.g., Williams v. Woodford*, 384 F.3d 567, 609 (9th Cir. 2004) ("The declarations [of Williams's mental health experts] do not describe how Williams's probable mental impairment interfered with his understanding of the proceedings against him.").

The record shows that Cordova was examined by Dr. Piasecki, a mental health expert, and that Dr. Piasecki opined that insanity would not likely be a viable defense. (ECF No. 14-6 at 16.) The record does not indicate that Dr. Piasecki expressed any concern about Cordova's competence during her discussions with counsel, or in her final report, which defense counsel submitted as mitigation evidence for sentencing.

11

Defense counsel who interacted with Cordova on numerous occasions and explained the plea to Cordova testified that they believed that Cordova had understood the plea agreement, and neither testified to any concerns about Cordova's competency to enter a plea. *See Medina v. California*, 505 U.S. 437, 450 (1992) ("[D]efense counsel will often have the best-informed view of the defendant's ability to participate in his defense."); *Williams*, 384 F.3d at 608 ("We find especially relevant defense counsel's opinion that Williams was competent to stand trial."). Finally, Cordova had signed the plea agreement, had been canvassed regarding his plea, and had stated that he understood the plea. *See Blackledge*, 431 U.S. at 74; *Muth*, 676 F.3d at 821.

Cordova argues that his confusion during the plea canvass about the potential sentences indicates that his mental health issues prevented him from understanding the proceedings. (ECF No. 61 at 15.) When Cordova was asked whether he understood the potential maximum sentence, he responded "25 to life." (ECF No. 14-1 at 10.) After his attorney clarified the sentencing ranges, Cordova then stated that the possible sentences were "25 to life, and 10 to 25 for the weapon, I believe." (*Id.* at 11.) After consulting with defense counsel, Cordova then correctly stated that he could be sentenced to a term of 10 to 25 years, or 10 to life with a second term of 1 to 20 years for the weapons enhancement. (*Id.*) Cordova's brief confusion on the exact details of sentencing does not support that the Nevada Supreme Court made an unreasonable determination of fact in finding that nothing in the record indicates that Cordova's mental health issues and prescribed medications prevented him from understanding the proceedings.

Finally, Cordova argues that his apparent confusion during the post-conviction evidentiary hearing indicated that his mental health issues prevented him from understanding the proceedings. (ECF No. 61 at 15.) During the evidentiary hearing, Cordova testified that he had believed a *nolo contendere* plea was the same as a not

12

guilty plea. However, Cordova also testified that he had only pleaded *nolo contendere* because defense counsel had told him that they did not have time to prepare for trial, indicating that Cordova understood that by pleading *nolo contendere* he was giving up his right to a trial and effectively pleading guilty. Moreover, during the plea canvass, Cordova had stated that he understood both the plea and the potential sentence, which is inconsistent with his later allegations that he had believed a *nolo contendere* plea was equivalent to a plea of not guilty. Defense counsel testified that, even following Cordova's sentencing, Cordova was not interested in an appeal, again indicating that Cordova understood that a *nolo contendere* plea was equivalent to a guilty plea.

On this record, the Nevada Supreme Court's determination that nothing in the record indicates that Cordova's mental health issues and prescribed medications prevented him from understanding the proceedings is not based on an unreasonable determination of the facts. Therefore, based on the record, the Nevada Supreme Court's determination that Cordova failed to demonstrate that his plea was invalid constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts. *See Godinez*, 509 U.S. at 396; *Dusky*, 362 U.S. at 402; *Brady*, 397 U.S. at 748. Cordova is not entitled to habeas relief on ground 1.

**B.    Ground 2—Cordova received effective assistance of counsel during the plea proceedings**

In ground 2, Cordova alleges that he received ineffective assistance counsel during the plea proceeding. (ECF No. 13 at 13.) In particular, he alleges that defense counsel's failure to ensure that Cordova entered a knowing, voluntary, and intelligent plea constituted ineffective assistance of counsel. (*Id.*)

**1.    Relevant law**

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to

demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

When the ineffective assistance of counsel claim is based "[i]n the context of a guilty plea, the ineffectiveness inquiry probes whether the alleged ineffective assistance impinged on the defendant's ability to enter an intelligent, knowing and voluntary plea of guilty." *Lambert v. Blodgett*, 393 F.3d 943, 979 (9th Cir. 2004). As such, "[t]o succeed, the defendant must show that counsel's assistance was not within the range of competence demanded of counsel in criminal cases." *Id.* at 979-80. And regarding the prejudice prong, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice.").

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable

14

is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's Strickland determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 2.  State court determination

In affirming the denial of Cordova's post-conviction petition, the Nevada Supreme Court held:

> Cordova argues that his trial counsel did not ensure that he understood the consequences of his plea and did not investigate before entry of the plea. To prove ineffective assistance of counsel sufficient to invalidate a judgment of conviction based on a plea, a petitioner must demonstrate that his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, petitioner would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985); *Kirksey v. State*, 112 Nev. 980, 988, 923 P.2d 1102, 1107 (1996). Both components of the inquiry must be shown. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
>
> Cordova argues that counsel should have investigated his mental health issues and possible defenses before advising him to enter a plea. He asserts that a psychological report had not been completed until after the plea was entered. We conclude that Cordova failed to demonstrate deficient performance. While a psychological report was prepared after entry of the plea for use at sentencing, counsel had discussed the expert's findings before advising Cordova to enter the plea. Based on these discussions, counsel concluded that they could not mount an effective defense to the

15

1

2

3

4

5

open murder charge based on the available evidence. Cordova further failed to demonstrate prejudice. He acknowledged during the plea canvass that the State could introduce sufficient facts to support his conviction. Counsel testified that, given the statements that Cordova made about the incident, any purported defenses would not likely have been successful. Thus, it was not reasonably probable that further investigation would have prompted Cordova to forgo the plea agreement and insist upon going to trial.

6

(ECF No. 14-11 at 2-3.)

7

### 3.    Analysis[6]

8

#### i.    Defense counsel's performance

9    Defense counsel has a "duty to make reasonable investigations or to make a

10   reasonable decision that makes particular investigations unnecessary." *Strickland*, 466

11   U.S. at 691; *see also Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003) ("Trial

12   counsel has a duty to investigate a defendant's mental state if there is evidence to

13   suggest that the defendant is impaired."). As the Nevada Supreme Court reasonably

14   noted, defense counsel in this case had retained an expert, Dr. Piasecki, to assess

15   Cordova's mental health. Cordova argues that his mental health issues should have

16   alerted defense counsel that he might not be competent to enter a plea. But the Nevada

17   Supreme Court reasonably found that defense counsel had spoken with Dr. Piasecki

18

19   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

20

21

22

23

24

25

26

27

[6]In his reply brief, Cordova argues that the Court should review this ground *de novo*. (ECF No. 61 at 19.) Cordova insists that the Nevada Supreme Court's findings that defense counsel investigated his mental health, as well as his claims and defenses, are irrelevant to his claim that defense counsel failed to ensure that he understood the consequences of his plea. (ECF No. 61 at 19.) Accordingly, Cordova argues the Nevada Supreme Court's decision was based on an unreasonable determination of the facts, an unreasonable application of the law, or both. (*Id.*) When presenting this issue before the Nevada Supreme Court, Cordova presented a broader argument, including that defense counsel was deficient for failing to properly investigate or explain to Cordova potential defenses, including self-defense or PTSD claims. (ECF No. 14-9 at 25-26.) As such, the Nevada Supreme Court's findings were directly related to the claims presented below. For the reasons discussed below, the Court rejects the argument that the Nevada Supreme Court's decision was based on an unreasonable determination of the facts or an unreasonable application of the law. Thus, the Court declines to review this ground *de novo*.

16

28

about the viability of an insanity defense and that, based on these discussions, defense counsel concluded that they could not mount a viable defense. The record does not indicate that Dr. Piasecki raised any question as to Cordova's competence to stand trial or enter a guilty plea. Moreover, as discussed above, the Nevada Supreme Court noted that Cordova had undergone a plea canvass and stated that he understood his plea.

Because Dr. Piasecki did not raise any questions as to Cordova's competence, and Cordova himself stated that he understood the plea during his plea canvass, the Nevada Supreme Court's decision to affirm the district court's conclusion that defense counsel's performance was not deficient constituted an objectively reasonable application of *Strickland*'s performance prong and was not based on an unreasonable determination of the facts. *See Strickland*, 466 U.S. at 688 ("Judicial scrutiny of counsel's performance must be highly deferential."); *see also Harrington*, 562 U.S. at 101 (explaining that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision") (citing *Yarborough*, 541 U.S. at 664). Cordova is thus not entitled to relief on ground 2.

### C.    Ground 3—conflict of interest

In ground 3, Cordova alleges that defense counsel suffered from a conflict of interest in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 13 at 14.)

#### 1.    Procedural default

Respondents argued in a motion to dismiss that ground 3 is procedurally defaulted because it was not presented to the Nevada Supreme Court. (ECF No. 26.) Cordova asked the Court to defer a resolution on this issue until the Petition was fully briefed on the merits, and Respondents agreed. (ECF No. 42 at 4.) The Court agreed to address the issue after the Petition was fully briefed. (*Id.*) In his reply brief, Cordova

agrees that ground 3 is procedurally defaulted, but he argues that he can show cause and prejudice to excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012).

"Generally, post-conviction counsel's ineffectiveness does not qualify as cause to excuse a procedural default." *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019) (citing *Coleman*, 501 U.S. at 754-55). However, in *Martinez*, the Supreme Court created a narrow exception to the general rule that errors of post-conviction counsel cannot provide cause for a procedural default. *Martinez*, 566 U.S. at 16-17. "Under *Martinez*, the procedural default of a substantial claim of ineffective assistance of trial counsel is excused, if state law requires that all claims be brought in the initial collateral review proceeding . . . and if in that proceeding there was no counsel or counsel was ineffective."[7] *Ramirez*, 937 F.3d at 1241 (citing *Martinez*, 566 U.S. at 17).

To establish cause and prejudice for a trial-level ineffective assistance of counsel claim under *Martinez*, a petitioner must show that:

> (1) post-conviction counsel performed deficiently; (2) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different, and (3) the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.

*Ramirez*, 937 F.3d at 1242 (internal quotation marks omitted). The first and second "cause" prongs of the *Martinez* test are derived from *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at 1241. Notably, the Court's determination of the second prong—whether there was a reasonable probability that the result of the post-conviction proceedings would be different—"is necessarily connected to the strength of the argument that trial

---

[7]The parties do not dispute that (i) a Nevada post-conviction petition in a state district court is an initial-review collateral proceeding for purposes of *Martinez*, and (ii) Nevada law requires a prisoner to present a trial-level ineffective assistance of counsel claim in the prisoner's first post-conviction petition for purposes of applying the *Martinez* rule. With these prerequisites satisfied, the Court proceeds to *Martinez*'s additional requirements. *See, e.g.*, *Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019) (discussing procedural default and *Martinez*'s requirements, as applied in the Nevada context).

counsel's assistance was ineffective." *Id.* (quoting *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014) ("The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different."), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015) (en banc)). The third "prejudice" prong directs the court to assess the merits of the underlying ineffective assistance of counsel claim. *Id.* at 1241. A procedural default will not be excused if the underlying ineffective assistance of counsel claim "is insubstantial," *i.e.*, it lacks merit or is "wholly without factual support." *Id.* (quoting *Martinez*, 566 U.S. at 14-16). This question is not the same as the question whether the claim warrants habeas relief. Instead, it is more akin to determining whether the claim is worthy of a certificate of appealability, and a petitioner must demonstrate the claim "has some merit." *See Martinez*, 566 U.S at 14. "Even if a court determines that a defendant has shown cause and prejudice sufficient to overcome a procedural default, that determination 'does not entitle the prisoner to habeas relief.'" *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017) (quoting *Martinez*, 566 U.S. at 17). "Rather, it allows a federal court to consider de novo 'the merits of a claim that otherwise would have been procedurally defaulted.'" *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017) (quoting *Martinez*, 566 U.S. at 17).

### 2.    Relevant Law

Effective assistance of counsel "includes a right to conflict-free counsel." *United States v. Mett*, 65 F.3d 1531, 1534 (9th Cir. 1995). In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). However, until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for

19

his claim of ineffective assistance.*See Id.* If counsel actively represents multiple defendants with conflicting interests, such that an actual conflict adversely affects counsel's performance, prejudice is presumed. *See id.* at 349-50. However, the Supreme Court has instructed that *Cuyler* "does not clearly establish, or indeed even support . . . expansive application" of that rule to cases outside the context of multiple concurrent representation. *Mickens v. Taylor*, 535 U.S. 162, 175 (2002). The presumption of prejudice only applies in the context of representation of multiple clients because of the "high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice." *Id*. A petitioner "must demonstrate that his attorney made a choice between possible alternative courses of action that impermissibly favored an interest in competition with those of the client." *McClure v. Thompson*, 323 F.3d 1233, 1248 (9th Cir. 2003). "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 349-50 (internal citation omitted).

### 3.   Factual Background

During a preliminary hearing at the state justice court, a question was raised as to whether the public defender's office had a conflict of interest representing Cordova because another attorney in the public defender's office had previously represented a potential witness. (ECF No. 27-1.) The court conducted a sealed hearing with defense counsel to address the issue. (ECF No. 37 at 4.) During the hearing, Defense Counsel 2 stated that he did not believe that there was any conflict of interest. (*Id.*) He stated that after a detailed analysis it was determined that there was not any information in the public defender's office that defense counsel could use or access. (*Id.* at 5.) He also testified that there was a screening process or "Chinese Wall" in place to ensure that

1  defense counsel did not communicate with the attorney who had previously represented

2  the witness. (*Id.* at 7-8.)

3         The court asked whether defense counsel could effectively cross-examine the

4  witness, and Defense Counsel 2 responded that he could impeach the witness with

5  issues that were distinct from his recent representation with the public defender's office,

6  including an earlier conviction, and his desire to obtain favorable consideration regarding

7  a possible pending parole revocation, or the dismissal of the case on which the public

8  defender's office had briefly represented him. (*Id.* at 5-6.) The court found that, for the

9  purposes of the preliminary hearing, there was no conflict. (*Id.* at 8-9.)

10         During the post-conviction evidentiary hearing, Defense Counsel 1 testified that

11  another inmate had contacted the prosecutor's office to say that Cordova had told him

12  that he had stabbed Mark Smith because of an argument over a woman. (ECF No. 14-

13  6.) Defense Counsel 1 testified that he was not sure whether the prosecution had noticed

14  the inmate as a witness before trial and that the prosecutor had been reluctant to use

15  him because the prosecutor had never used a "jailhouse snitch before." (*Id.* at 43.)

16              **4.    Analysis**

17         Cordova argues that an actual conflict impaired defense counsel's representation

18  because defense counsel could not impeach the witness if he was called to testify. (ECF

19  No. 61 at 22.) Cordova further asserts that this conflict adversely affected defense

20  counsel's plea advice because defense counsel knew that they would be ethically bound

21  not to impeach the witness if he were called to testify. (*Id.*)

22         These arguments are unavailing. Defense Counsel 2 stated during the

23  preliminary hearing that he would not have a problem impeaching the witness. There is

24  no evidence in the record that any issues regarding impeachment of the witness factored

25  into defense counsel's negotiation of the plea agreement or defense counsel's

26  recommendation that Cordova accept the plea agreement. Defense Counsel 1 noted

27

28

the witness as one possible weakness in Cordova's case, but he also testified that he was not sure whether the witness had been noticed and that he knew the prosecutor had been reluctant to use a jailhouse snitch as a witness. Defense Counsel 1's primary concerns regarding the strength of the case had to do with Cordova's statement on the 911 call, and Cordova's phone call to a friend from the jail stating that he had stabbed someone. As such, the record does not support that a different public defender's previous representation of the witness had any impact on the defense counsel's legal advice or strategy. To the contrary, the record indicates that defense counsel had been screened from any potential conflict, which prevented defense counsel from any discussion with the attorney who had represented the witness.

Cordova also argues that this "Chinese Wall" supports that he was prejudiced because his defense counsel was not aware that the witness had expressly stated that he had shared Cordova's statements to further his own personal interests. It is unclear how defense counsel's inability to communicate with the witness's counsel could have prejudiced Cordova. Any counsel appointed for Cordova would not have had access to information from the witness's attorney. Moreover, in the preliminary hearing, Defense Counsel 2 specifically indicated that he could impeach the witness based on the witness's potential desire to receive a favorable outcome regarding parole revocation or dismissal of a case. Therefore, counsel was already aware of the potential to impeach the witness through questions about whether the witness was testifying to further his own self-interest.

Cordova provides no evidence to support the existence of an actual conflict of interested that adversely affected defense counsel's representation of him or impacted defense counsel's recommendation that Cordova accept the plea agreement. Thus, Cordova does not show that the underlying claim that his defense counsel were

1   ineffective has "some merit." Accordingly, the underlying claim is not substantial, so

2   ground 3 is procedurally defaulted, and dismissed. *See Martinez*, 566 U.S. at 14.

3   **5.   Evidentiary Hearing**

4   In his reply brief, Cordova requests that, if the Court finds that the record does

5   not establish cause and prejudice for ground 3 under *Martinez*, the Court order an

6   opportunity to present further evidence on this subject. (ECF No. 61 at 29.) However,

7   on May 23, 2022, after Cordova filed the reply brief, the United States Supreme Court

8   issued its ruling in *Shinn v. Ramirez*, 142 S. Ct. 1718, 1735 (2022), holding that a federal

9   habeas court may not conduct an evidentiary hearing or otherwise consider evidence

10  beyond the state court record based on ineffective assistance of state postconviction

11  counsel unless the prisoner can satisfy 28 U.S.C. § 2254(e)(2)'s stringent requirements

12  under AEDPA. *Shinn*, 142 S. Ct. at 1734-1735. Under 28 U.S.C. § 2254(e)(2), if a

13  petitioner has failed to develop the factual basis of a claim in state court, a court shall

14  not hold an evidentiary hearing on the claim unless "(A) the claim relies on-- (i) a new

15  rule of constitutional law, made retroactive to cases on collateral review by the Supreme

16  Court, that was previously unavailable; or (ii) a factual predicate that could not have

17  been previously discovered through the exercise of due diligence . . . " Cordova's claim

18  that trial counsel had a conflict does not meet either of these requirements. Accordingly,

19  the Court denies Cordova's request for an evidentiary hearing.

20  **V.   CERTIFICATE OF APPEALABILITY**

21  This is a final order adverse to Cordova. Rule 11 of the Rules Governing Section

22  2254 Cases requires this court issue or deny a certificate of appealability (COA). This

23  court has *sua sponte* evaluated the remaining claims within the Petition for suitability for

24  the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-

25  65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the

26  petitioner "has made a substantial showing of the denial of a constitutional right." With

27

28

respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the Petition states a valid claim of the denial of a constitutional right and (2) whether this court's procedural ruling was correct. *Id.*

Applying these standards, the Court finds that a certificate of appealability is unwarranted.

## VI. CONCLUSION

It is therefore ordered that Petitioner Cordova's counseled amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 13) is denied.

It is further ordered that a certificate of appealability is denied.

The Clerk of Court is directed to substitute Fernandies Frazier for Respondent Isidro Baca, enter judgment accordingly, and close this case.

DATED THIS 30th Day of September 2022.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

24